# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED MINE WORKERS OF AMERICA, ET. AL., | ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No. 4:08CV1777SNLJ |
| AMERICAN COMMERCIAL LINES TRANSPORTATION SERVICES, LLC, ET. AL., | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Plaintiffs United Mine Workers of America (UMWA) and individual plaintiffs[1] (hereinafter referred to as the Retiree Plaintiffs) contend that the defendants ACL Transportation Services (ACLTS) and American Commercial Lines (ACL) made detrimental unlawful unilateral modifications to the Retiree Plaintiffs' retirement medical benefits in the 2008 Collective Bargaining Agreement (CBA). They seek declaratory judgment, injunctive relief, compensatory damages, and "other relief" requiring the defendants to provide health benefits to the Retiree Plaintiffs in accordance with their respective CBAs existing at the time of their retirements. This matter is before the Court on the defendants' motion for summary judgment [20], filed October

---

[1]Kenneth Holt, Donald Meyer, Leroy Shea, Wayne Skaggs, Debbie Jackson, and Kathryn McCord. In most instances the Court will refer to the UMWA and the Retiree Plaintiffs collectively as "plaintiffs"; however, in certain instances the Court may refer to the plaintiffs separately as either the UMWA or the Retiree Plaintiffs.

16, 2009. Extensive responsive pleadings and voluminous exhibits in support have now all been filed. This matter is pending a resetting on the Court's trial docket.[2]

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it.

---

[2]On June 2, 2010 this Court granted the defendants' motion to strike jury demand. *See*, Court Order and Memorandum [51 and 52]. Thus, this cause of action became a matter for bench trial. On June 17, 2010 this Court granted the plaintiffs' motion to certify the Court's Order of June 2, 2010 for interlocutory appeal under 28 U.S.C §1292(b). *See*, Court Order [59]. The Court also removed this case from the Court's July 7, 2010 trial docket until further notice. On July 27, 2010 the Eighth Circuit Court of Appeals denied the interlocutory appeal without prejudice subject to being renewed after the subject motion for summary judgment has been resolved in this Court. *See*, Mandate of Eighth Circuit Court of Appeals [64].

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986);

Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts.  Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983).  The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976).

Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party."  Hindman v. Transkrit Corp., 145 F.3d. 986, 990 (8th Cir. 1998)(citations omitted); *see*, Mayer v. Nextel West Corp., 318 F.3d. 803, 806 (8th Cir. 2003) *citing* Keathley v. Ameritech Corp., 187 F.3d. 915, 919 (8th Cir. 1999).  However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy.  Putnam v. Unity Health Systems, Inc., 348 F.3d. 732, 733-34 (8th Cir. 2003) *quoting* Wilson v. Int'l Bus. Mach. Corp., 62 F.3d. 237, 241 (8th Cir. 1995); Girten v. McRentals, Inc., 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's theory of age discrimination failed "[b]ecause this theory is supported more by contentions and speculation than evidence, it is insufficient to withstand summary judgment."). Thus, the nonmoving party cannot rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d. 953, 957 (8th Cir. 1995). Thus, a party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact.  Crossley v. Georgia-Pacific Corp., 355 F.3d. 1112, 1114 (8th Cir.

2004).  Self-serving, conclusory statements without proper evidentiary support are not sufficient

to defeat summary judgment.  <u>Conolly v. Clark</u>, 457 F.3d. 872, 876 (8th Cir. 2006).

Prior to setting out the Court's findings of facts relevant to the issues raised in the

summary judgment motion, the Court must first address two(2) matters.  Firstly, after careful

review and consideration, the Court finds that the plaintiffs' statement of material facts [23] fails

to meet the standards set forth by Rule 56(e)(1) Fed.R.Civ.P. and Local Rule 4.01.  This Court

has already ruled that substantial portions of the declarations attached to the plaintiffs' statement

of material facts will be stricken for a myriad of reasons.  *See*, Court Order [65], filed September

15, 2010.  Furthermore, the plaintiffs' statement fails to respond properly pursuant to Local Rule

4.01 to the defendants' statement of undisputed material facts [22].

Local Rule 4.01 requires a party opposing a motion for summary judgment to respond to

the moving party's statement of material facts in a specified manner:

> "Every memorandum in opposition shall include a statement of
> material facts as to which the party contends a genuine issue exists.
> Those matters in dispute shall be set forth with specific references
> to portions of the record, where available, upon which the opposing
> party relies.  The opposing party also shall note for all disputed
> facts the paragraph number from movant's listing of facts. All
> matters set forth in the statement of the movant shall be deemed
> admitted for purposes of summary judgment unless specifically
> controverted by the opposing party."

The plaintiffs did not directly respond to the defendants' statement of undisputed material facts by

either noting the paragraph numbers of the disputed facts or setting forth specific references to the

portions of the record upon which the plaintiffs rely in opposing the disputed facts in question.

Instead, they simply provide a general reference to those paragraphs in the defendants' statement

of undisputed material facts to which they oppose:

> *"Plaintiffs submit that the facts set forth in Defendants Statement*
> *of Undisputed Material Facts paragraphs 11 through 49 (pertaining*

> *to the 1994, 1999 and 2004 UMWA-ACLTS Wage Agreements
> and certain Employer Benefit Plan documents) rely on selective
> quotations from documents in a manner that is so incomplete as
> to effectively misrepresent the content of those documents and to
> obfuscate and disregard the material facts relevant for a determination
> of Plaintiffs' claims. Accordingly, Plaintiffs present paragraphs
> 1 through 22 below to provide material and necessary background
> regarding the lifetime nature of ACLTS's contractual obligation
> to pay retiree health care of the individual Plaintiffs herein."*

Plaintiffs' Statement of Material Facts [23], pgs. 1-2. Plaintiffs further state:

> *"Plaintiffs submit that paragraphs 23-28, below, dispute
> Defendants' Statement of Undisputed Material Facts
> paragraphs 10 through 16 and paragraphs 36 through 42."*

Plaintiffs' Statement of Material Facts [23], pg. 11. Plaintiffs further state:

> *"Plaintiffs submit that paragraphs 29 through 30, below, dispute
> Defendants' Statement of Undisputed Material Facts paragraphs
> 17 through 23. To the extent that Defendants contend that the
> terms of the 1997 Summary Plan Description (Exh. H-2 to the Bruns
> Deposition) governed the Employer Benefit Plan during the term
> of the 1999 UMWA-ACLTS Wage Agreement, Plaintiffs submit
> that the following facts dispute Defendants' paragraphs 40
> through 42."*

Plaintiffs' Statement of Material Facts [23], pg. 15. Plaintiffs further state:

> *"Plaintiffs submit that paragraphs 31 through 35, below, dispute
> Defendants' Statement of Undisputed Material Facts paragraphs
> 24 through 35 and 47 through 49."*

Plaintiffs' Statement of Material Facts [23], pg. 16. Plaintiffs further state:

> *"Plaintiffs submit that paragraph 36 through 54, below, dispute
> Defendants' Statement of Undisputed Material Facts paragraphs
> 52 through 58 and paragraph 65."*

Plaintiffs' Statement of Material Facts [23], pg. 19.

Plaintiffs not only make an improper general denial to groups of paragraphs in the

Defendants' Statement of Undisputed Material Facts but their opposing "facts" are largely legal

argument with citations to caselaw. They fail to identify any specific facts to which they object

and their supporting record is essentially the declarations which this Court has already deemed inadmissible in large part (as well as the previously mentioned caselaw). For purposes of the defendants' motion for summary judgment, the Court deems the defendants' statement of undisputed material facts [22] admitted, except where specifically and properly controverted. *See*, Donnelly v. St. John's Mercy Medical Ctr., 635 F.Supp.2d. 970, 975, n.1 (E.D.Mo. 2009); Brasch v. Peters, 479 F.Supp.2d. 1045, 1056, n.3 (E.D.Mo. 2007). The Court's recitation of undisputed material facts is therefore taken largely from the defendants' statement of undisputed material facts [22} and the evidentiary record before the Court.

Secondly, the plaintiffs continuously argue and appear to rely heavily on the notion that resolution of the summary judgment motion (and for all purposes, the case itself) requires the Court to take an in depth look at the history of agreements between the UMWA and the Bituminous Coal Operators' Association (BCOA). These agreements, known as the NBCWAs, involve a series of collective bargaining agreements negotiated between the UMWA and the BCOA since 1947. The undisputed record before this Court clearly shows that the defendants have never operated a mine, have never been a member of the BCOA, and have never been signatories to any NBCWA. The record also shows that, during the relevant time-period, ACLTS and UMWA have negotiated on a single-employer basis and entered into a series of CBAs not involving in any way the BCOA. Furthermore, the Retiree Plaintiffs have all admitted on the record that they are retirees of defendant ACLTS (or the spouses of ACLTS retirees) who retired under various CBAs negotiated solely by the UMWA and ACLTS, not with the BCOA or any of the NBCWAs. Finally, the plaintiffs continually argue that the NBCWAs govern the CBAs at issue, yet fail to identify any provision within any of the pertinent CBAs that "incorporates" any provision of any NBCWA or the entirety of any NBCWA. Thus, it is the Court's considered

opinion that the history and/or existence of NBCWAs between the UMWA and BCOA is irrelevant to any issue present in this case, much less the pending summary judgment motion. The Court will disregard any argument involving the applicability of the NBCWAs or exhibits to that end. The relevant documents for the Court's consideration are the 1994 CBA, the 1999 CBA, the 2004 CBA, and the 2008 CBA, as well as the 1994 Plan, the 2003 Plan, and the 1997 and 2003 SPD ("summary plan description").

During the relevant time-period, ACLTS (or its predecessors) operated a rail-to-barge coal storage and transloading facility on the shores of the Mississippi River in St. Louis, Missouri aka the "Western Terminal".[3] Plaintiff UMWA is a labor organization ( a union) that has represented employees at ACLTS' Western Terminal for collective bargaining purposes since 1979. Derringer Deposition, Defendants' Exhibit A-SJ, pg. 22.[4] Four (4) Retiree Plaintiffs are former employees of ACLTS at the Western Terminal: Holt, Meyer, Shea, and Skaggs. Jackson is the surviving spouse of Marvin Jackson, who passed away on February 18, 2001 while employed by ACLTS at the Western Terminal. McCord is the surviving spouse of Carl McCord, who passed away in June 1996 while employed by ACLTS at the Western Terminal.

_____

[3]The evidentiary record before the Court consists of, but not limited to, numerous deposition testimonies, copies of the relevant CBAs (or portions thereof), admissible portions of the declarations filed by the plaintiffs, copies of the relevant welfare plans (or portions thereof), and exhibits in support of the plaintiffs' damage claims. In some cases, the parties have filed identical exhibits either as attachments to pleadings or as deposition exhibits. The Court, in its usual practice, will cite to one exhibit as opposed to both duplicative exhibits; however, the cited exhibit does not in any way reflect bias on the Court's part or indicative of the Court's final disposition of this matter. It is simply a matter of judicial efficiency.

[4]Numerous exhibits have been filed as attachments to various pleadings and are earmarked with the same letter or number. For example, different portions of Bill Derringer's deposition testimony [Exhibit A] have been attached to both the summary judgment motion and defendants' response to plaintiffs' statement of facts [28]. To distinguish between the same exhibit being attached to different pleadings, the Court will identify the pleadings; e.g. Exhibit A-SJ refers to Exhibit A attached to the summary judgment motion.

Each of the Retiree Plaintiffs, or the respective deceased spouse, was a "bargaining unit employee" of ACLTS at the Western Terminal prior to April 1, 2003. The Retiree Plaintiffs, or the respective spouse, retired from ACLTS on the following dates: Carl McCord (June 1996); Donald Meyer (August 1997); Wayne Skaggs (July 2000); Marvin Jackson (February 2001); Leroy Shea (May 2006); and Kenneth Holt (November 2007). Defendants' Exhibits B-SJ, pg. 7; C-SJ, pg. 13; D-SJ, pg. 22; E-SJ, pg. 19; F-SJ, pg. 16; and G-SJ, pg. 35. The UMWA negotiates over healthcare benefits for retirees, and the UMWA represents each of the Retiree Plaintiffs in this lawsuit. Defendants' Exhibits B-SJ, pgs. 9, 11; C-SJ, pgs. 15, 42-43; D-SJ, pgs. 9, 64-65; E-SJ, pgs. 8, 10, 21, 44-45; F-SJ, pgs. 9, 10, 11; and G-SJ, pgs. 8, 10, 18.

The UMWA and ACLTS have been parties to a series of CBAs between 1994 to the present that set forth the terms and conditions of employment and benefits (including retirement benefits) of individuals employed at ACLTS' Western Terminal.

<u>1994 CBA</u>

The 1994 CBA negotiated between the UMWA and ACLTS became effective December 1, 1994 and expired by its terms on November 30, 1999. UMWA Exhibit 1; Derringer Deposition, Exh.A-SJ, pg. 26-27.

Article XX of the 1994 CBA covers Health and Retirement Benefits. Article XX "makes provision for pension, health, and other benefits for Employees covered by this Agreement." UMWA Exh.1, pg. 30. Article XX required ACLTS to "establish and maintain an Employee benefit plan to provide . . . health and other non-pension benefits for its employees covered by [the] Agreement as well as pensioners . . . whose last signatory employment was with [ACLTS]." Defendants Exh. A-1(SJ), Art.XX(c)(3)(i), pg. 30. Art. XX(c)(3)(i) further states that "[t]he benefits provided by the Employer **[employer being ACLTS]** to its eligible Participants pursuant

to such plan shall be guaranteed during the term of this Agreement by the Employer at levels set forth in such plan." Art.XX(h)states "[i]n addition, each signatory Employer hereby agrees to fully guarantee the health benefits provided under its own Employer Plan described in Section (c)(3)(i) of this Article XX during the term of this Agreement. UMWA, Exh.1, pg. 35.

Article XX(h)(10) entitled "HEALTH CARE" states that "[h]ealth care benefits provided under the Employer Benefit Plan are guaranteed during the term of this Agreement subject to the terms of this Agreement at the level of benefits provided in the Employer Benefit Plan." Defendants' Exh.A-1(SJ), pg. 40. Article XX(h) further sets out the co-payments for both "working persons" and "non-working persons" pursuant to the 1994 Plan.

The "GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS" states that

> "[t]he following is a general description of certain information contained in the UMWA 1974 Pension Plan and Trust and the individual Employer's benefit plan. This description is intended merely to highlight certain information; it is not a complete statement of all of the provisions of the Plans and Trusts, nor is it intended to be a Summary Plan Description as defined in the Employee Retirement Income Security Act of 1974, and is qualified in its entirety by, and subject to the more detailed information contained in the Plans and Trusts, copies of which are on file and available for inspection at the offices of the UMWA Health & Retirement Fund, 4455 Connecticut Avenue, NW, Washington, D.C. 20008. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

> The benefits provided by the 1993 Benefit Trust shall initially be equivalent to those provided by the Employer Benefit Plans maintained pursuant to this Article. Such plan of benefits may be amended from time to time, as determined by the 1993 Benefit Plan Trustees. Benefits under the 1993 Benefit Trust shall only be those that can be provided from the assets of the Trust, but the total package of benefits under the Plan shall not exceed the value of the benefits provided under the individual Employer Plan pursuant to this Article.

> The parties expressly agree that the language references to "for life" and "until death" that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees who retired between February 1, 1993 and the Effective Date, or who retire during the term of this Agreement. A retiree shall be considered to be a retiree of the Employer if his last signatory classified employment was with such Employer. The benefits and benefit levels provided by an Employer under its Employer Plan are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement."

Defendants' Exh.A-1(SJ), pg. 35.

### 1999 CBA

Upon expiration of the 1994 CBA, UMWA and ACLTS negotiated another CBA which became effective December 1, 1999 and expired by its terms on November 30, 2004. UMWA Exh.4. Article XX entitled "HEALTH AND RETIREMENT BENEFITS" provides that "[t]his Article makes provision for pension, health and other benefits for Employees covered by this Agreement. The benefits to be provided are as set forth under separate plans and trusts referred to in Section (c) of this Article." Article XX further states "[a] general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans govern in the event of any inconsistencies between the general description and the plans." Defendants' Exh.A-2(SJ), pg. 30.

Again, Article XX required ACLTS to "establish and maintain an Employee benefit plan to provide . . . health and other non-pension benefits for its employees covered by [the] Agreement as well as pensioners . . . whose last signatory employment was with [ACLTS]." Defendants Exh. A-2(SJ), Art.XX(c)(3)(i), pg. 30. Art. XX(c)(3)(i) further states that "[t]he benefits provided by the Employer **[employer being ACLTS]** to its eligible Participants pursuant

to such plan shall be guaranteed during the term of this Agreement by the Employer at levels set forth in such plan."

Article XX(h)(10) entitled "HEALTH CARE" states that "[h]ealth care benefits provided under the Employer Benefit Plan are guaranteed during the term of this Agreement subject to the terms of this Agreement at the level of benefits provided in the Employer Benefit Plan." Defendants' Exh.A-2(SJ), pg. 43. Article XX(h) further sets out the co-payments for both "working persons" and "non-working persons" pursuant to the 1999 Plan.

The "GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS" in the 1999 CBA again states that

> "[t]he following is a general description of certain information contained in the UMWA 1974 Pension Plan and Trust and the individual Employer's benefit plan. This description in intended merely to highlight certain information; it is not a complete statement of all of the provisions of the Plans and Trusts, nor is it intended to be a Summary Plan Description as defined in the Employee Retirement Income Security Act of 1974, and is qualified in its entirety by, and subject to the more detailed information contained in the Plans and Trusts, copies of which are on file and available for inspection at the offices of the UMWA Health & Retirement Fund, 4455 Connecticut Avenue, NW, Washington, D.C. 20008. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

> The benefits provided by the 1993 Benefit Trust shall initially be equivalent to those provided by the Employer Benefit Plans maintained pursuant to this Article. Such plan of benefits may be amended from time to time, as determined by the 1993 Benefit Plan Trustees. Benefits under the 1993 Benefit Trust shall only be those that can be provided from the assets of the Trust, but the total package of benefits under the Plan shall not exceed the value of the benefits provided under the individual Employer Plan pursuant to this Article.

> The parties expressly agree that the language references to "for life" and "until death" that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees who retired between February 1, 1993

and the Effective Date, or who retire during the term of this Agreement.
A retiree shall be considered to be a retiree of the Employer if his last
signatory classified employment was with such Employer. The benefits
and benefit levels provided by an Employer under its Employer Plan
are established for the term of this Agreement only, and may be jointly
amended or modified in any manner at any time after the expiration or
termination of this Agreement."

Defendants' Exh.A-2(SJ), pg. 35-36.

2004 CBA

Upon expiration of the 1999 CBA, the UMWA and ACLTS negotiated another CBA

which became effective December 1, 2004 and expired by its terms on November 30, 2007.

Article XX entitled "HEALTH AND RETIREMENT BENEFITS" provides that "[t]his Article

makes provision for pension, health and other benefits for Employees covered by this Agreement.

The benefits to be provided are as set forth under separate plans and trusts referred to in Section

(c) of this Article." Article XX further states "[a] general description of the benefits to be

provided appears immediately following this Article. The specific provisions of the plans govern

in the event of any inconsistencies between the general description and the plans." Defendants'

Exh.A-3(SJ), pg. 29.

Again, Article XX required ACLTS to "establish and maintain an Employee benefit plan

to provide . . . health and other non-pension benefits for its employees covered by [the]

Agreement as well as pensioners . . . whose last signatory employment was with [ACLTS]."

Defendants Exh. A-3(SJ), Art.XX(c)(3)(i), pg. 30. Art. XX(c)(3)(i) further states that "[t]he

benefits provided by the Employer **[employer being ACLTS]** to its eligible Participants pursuant

to such plan shall be guaranteed during the term of this Agreement by the Employer at levels set

forth in such plan."

Article XX(h)(10) entitled "HEALTH CARE" states that "[h]ealth care benefits provided under the Employer Benefit Plan are guaranteed during the term of this Agreement subject to the terms of this Agreement at the level of benefits provided in the Employer Benefit Plan." Defendants' Exh.A-3(SJ), pg. 42. Article XX(h) further sets out the co-payments for both "working persons" and "non-working persons" pursuant to the 1994 Plan.

The "GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS" in the 2004 CBA again states that

> "[t]he following is a general description of certain information contained in the UMWA 1974 Pension Plan and Trust and the individual Employer's benefit plan. This description in intended merely to highlight certain information; it is not a complete statement of all of the provisions of the Plans and Trusts, nor is it intended to be a Summary Plan Description as defined in the Employee Retirement Income Security Act of 1974, and is qualified in its entirety by, and subject to the more detailed information contained in the Plans and Trusts, copies of which are on file and available for inspection at the offices of the UMWA Health & Retirement Fund, 4455 Connecticut Avenue, NW, Washington, D.C. 20008. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

> The benefits provided by the 1993 Benefit Trust shall initially be equivalent to those provided by the Employer Benefit Plans maintained pursuant to this Article. Such plan of benefits may be amended from time to time, as determined by the 1993 Benefit Plan Trustees. Benefits under the 1993 Benefit Trust shall only be those that can be provided from the assets of the Trust, but the total package of benefits under the Plan shall not exceed the value of the benefits provided under the individual Employer Plan pursuant to this Article.

> The parties expressly agree that the language references to "for life" and "until death" that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees who retired between February 1, 1993 and the Effective Date, or who retire during the term of this Agreement. A retiree shall be considered to be a retiree of the Employer if his last signatory classified employment was with such Employer. The benefits and benefit levels provided by an Employer under its Employer Plan

13

are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement."

Defendants' Exh.A-32(SJ), pg. 34-35.

The 2004 CBA includes a health benefits package for active employees and pensioners resulting from a series of proposals and counter-proposals. In September 2004, UMWA Representative Lee Roy Mumbower met with ACLTS to negotiate the 2004 CBA. UMWA proposed carrying forward the health benefits package for active employees and pensioners that was provided in the 1999 CBA. UMWA rejected ACLTS' initial proposal and threatened a strike. Eventually, ACLTS proposed that if UMWA would accept certain minimal increases to co-pays on prescription drug coverage, then these costs could be offset by the elimination of the co-pays for physician services. UMWA accepted this proposal. Mumbower Declaration, ¶9, Sentences 1, 2, 4, 7, and 8. Thus, the co-payments for prescription drugs under the 2004 CBA were at least three (3) times more costly than the co-payments provided for in either the 1994 or the 1999 CBAs. Additionally, the 2004 CBA contained a schedule of benefits providing for different levels of benefit coverage depending upon whether the plan participant visited an "in-network" or an "out-of-network" healthcare provider.

Both Retiree Plaintiffs Meyer (retired under the 1994 CBA) and Skaggs (retired under the 1999 CBA) have acknowledged that their co-payments for prescription drugs were modified in accordance with the benefit levels established under the 2004 CBA upon its effective date. Meyers Deposition, Exh.E(SJ), pgs. 44-45 and attached exhibits; Skaggs Deposition, Exh.G(SJ), pgs. 58-59 and attached exhibits. Between the time of his retirement and the effective date of the 2004 CBA, Retiree Plaintiff Meyers paid $5 in co-payments for prescription drugs and physician visits. During the term of the 2004 CBA, his co-payments increased to $15 or more. Between

the time of his retirement and the effective date of the 2004 CBA, Retiree Plaintiff Skaggs paid $5

in co-payments for prescription drugs and physician visits.  During the term of the 2004 CBA, his

co-payments increased to $15 or more.  Meyers Deposition, Exh.E(SJ), pgs. 37-40, 42; and

attached exhibits; Skaggs Deposition, Exh. G(SJ), pgs. 45-46, 47-52, and attached exhibits.

As previously noted, the 1994, 1999, and 2004 CBAs all required ACLTS to establish an

Employer Benefit Plan "to provide . . . health and other non-pension benefits for its employees

covered by [the CBAs] as well as pensioners . . . whose last signatory classified employment was

with [ACLTS]."  Each of these CBAs also stated, in Article XX, that [t]he plans established

pursuant to this subsection are incorporated by reference and made a part of this Agreement, and

the terms and conditions under which the health and other non-pension benefits will be provided

under such plans are as to be set forth in such plans."  Article XX(c)(3)(i) - UMWA Exh. 1, pg.

31; UMWA Exh. 4, pg. 31; UMWA Exh. 7, pg. 30.

1994 Plan

Pursuant to Article XX(c)(3)(i) of the 1994 CBA, ACLTS provided benefits to its

employees under the American Commercial Lines, Inc. Medical Benefit Plan for Employees of Its

Subsidiary Companies, which was amended and restated as of January 1, 1994.  Defendants'

Exhibit H (SJ) - Declaration of Richard Bruns and attached Exhibit H-1.  ACLTS was a

participating employer under the Plan.  The 1994 Plan is structured such that it contains general

benefit provisions that apply to each subsidiary company of American Commercial Lines (ACL)

that adopts the Plan, then contains schedules that set forth specific benefit provisions applicable to

each particular subsidiary company.  Schedule D-2 in the 1994 Plan contains the specific

provisions applicable to ACLTS' Western Terminal.  Defendants' Exh H-1(SJ), ACL 001157.

The 1994 Plan contains a "coordination of benefits" clauses. Article 3.6 of the 1994 Plan explains that "continuation of coverage will not be afforded if medical coverage is provided through an "other plan" as defined in Article 9." Defendants' H-1(SJ), pg. 29, ACL001054. Furthermore, "once a Retiree Participant, or the Dependent of a Retiree Participant, becomes entitled to Medicare, the plan of Benefits shall change to the Medicare-Eligible Retiree Expense Benefits described in Schedule G attached hereto and incorporated by reference." Id. Additionally, Article 9 of the 1994 Plan, entitled "Coordination of Benefits and Subrogation Provisions", establishes provisions for coordinating benefits provided under the Plan with "other plans" including Medicare. Article 9.2, pg. 73, ACL001100. It states "[w]ith respect to any benefit to which Section 9.2(a) shall apply, the Benefits that would otherwise be payable hereunder shall be reduced to the extent that the sum of the Benefits payable for Allowable Expenses hereunder and the benefits payable for Allowable Expenses under all "other plans" . . . shall not exceed the total applicable Allowable Expenses." Article 9.2(b), pg. 73, ACL001100.

Article 13 of the 1994 Plan is entitled "AMENDMENT AND TERMINATION". It contains a provision entitled "Amendment of the Plan" which states:

> "The Board of Directors of the Sponsor shall have the right, at any time or from time to time, to modify, alter, or amend any or all of the provisions of the Plan without the consent of any Affiliate, Employer, Employee, or Participant under the Plan, unless restricted by a collective bargaining agreement."

Article 13.1, pg. 84, ACL 001111.

Article 13 of the 1994 Plan also contains a termination provision which states:

> "The Sponsor expects and intends to continue the Plan indefinitely, but continuance is not assumed as a contractual obligation., and the Sponsor reserves the right, through action of its Board of Directors, to terminate the Plan, in whole or in part, at any time, subject to any limitation on such right as may be contained in a collective bargaining agreement."

Article 13.2, pg. 84, ACL001111.

1997 Summary Plan Description

In October 1997, ACLTS issued a revised summary plan description (SPD) for the Plan.

Defendants' Exh. H(SJ) Bruns Declaration and attached Exh.H-2. The 1997 SPD provides for

coordination of benefits in Article III. Article III, Section 10(d)(1) states:

> "For Pensioners and Surviving Spouses the benefits provided
> under the Plan will not be paid to a Beneficiary otherwise
> eligible if such Beneficiary is eligible for Hospital Insurance
> coverage (Part A) of Medicare where a premium is not
> required and/or Medical Insurance coverage (Part B) of
> Medicare unless such Beneficiary is eligible. Any such
> Beneficiary who is enrolled in a Medicare program shall
> receive the benefits provided under the Plan only to the
> extent such benefits are not provided for under Medicare."

Defendants' Exh H-2, pg. 28, ACL000998. Article III further provides for non-duplication of

health benefits. Article III, Section 10(f)(1)(i) states:

> "The health benefits provided under this Plan are subject to a
> non-duplication provision as follows:
> 1. Benefits will be reduced by benefits provided under any
> other group plan, including a plan of another Employer signatory
> to the UMWA Agreement, if the other plan:
> > (i) does not include a coordination of benefits or non-
> > duplication provision, or (ii) includes a coordination of
> > benefits or non-duplication provision and is the primary
> > plan as compared to this Plan."

Defendants' Exh.H-2, pg. 29, ACL000999. Artcle III further provides for the examination of "all

documents and records pertaining to your benefits under this plan" in the Plan Administrator's

Human Resources Benefits Department office during normal business hours. Defendants' Exh.H-

2, pg. 45, ACL001014. Finally, in a section entitled "Future of the Plans", the 1997 SPD states:

> "The Company intends to continue the plans in this handbook
> indefinitely. However, the Company reserves the right to amend
> or terminate them at any time. For example, the plans may be changed
> to comply with new federal, state or local laws or regulations. Or the

17

plans may be terminated for business reasons . . .".

This section further makes it clear that any health benefit claim filed before the plan amendment became effective or in the event of termination, would be honored.  Finally, this section expressly states that in the event of termination of the **pension plan**, "you will be fully vested in your earned benefit."  Defendants' Exh.H-2, pg. 45, ACL001014 (emphasis added).

<u>2003 Plan</u>

Effective January 1, 2003, ACL again restated the American Commercial Lines, Inc. Medical Benefits Plan for Its Employees and Employees of Its Subsidiary Companies (2003 Plan). Defendants' Exh.H(SJ)- Bruns Declaration and attached Exh.H-3.  The 1994 Plan and the 2003 Plan share the same design. ACLTS was a participating employer under the 2003 Plan. Schedule G in the 2003 Plan contains the specific provisions applicable to ACLTS' Western Terminal.  The 2003 Plan incorporated by reference the CBA then in existence between UMWA and ACLTS applicable to the Western Terminal employees. Defendants' Exh.H-3, Introduction, ACL00686; Schedule G, pgs. ACL000840, ACL000841.

The 2003 Plan contains coordination of benefits provisions.  Article 3.6 entitled "Continuation for Retirees" provides that "[n]otwithstanding anything to the contrary, continuation of coverage will not be afforded if medical coverage is provided through an "other plan" as defined in Article 9".  Defendants' Exh.H-3, pg. 27, ACL000712.  Article 3.6  further states that "[h]owever, once a Retiree Participant, or the Dependant of a Retiree Participant, becomes entitled to Medicare, the plan of Benefits shall change to the Medicare-Eligible Retiree Medical Expenses Benefits described in Section 4.10."  Defendants' Exh.H-3, pg. 27, ACL000712.

Article 9 of the 2003 Plan contains further coordination of benefits and subrogation provisions similar to the ones in the 1994 Plan. Article 9, Section 9.2(b) states, in pertinent part::

> "With respect to any benefit to which Section 9.2(a)
> shall apply, the Benefits that would otherwise be
> payable hereunder shall be reduced to the extent that the
> sum of the Benefits payable for Allowable Expenses
> hereunder and the benefits payable for Allowable Expenses
> under all 'other plans', except as provided in Section 9.2(c),
> shall not exceed the total applicable Allowable Expenses."

Defendants' Exh.H-3, pg. 65, ACL000750.

The 2003 Plan also contains an "Amendment of the Plan" provision that is similar to the amendment provision in the 1994 Plan. Article 13, Section 13.1 states in pertinent part:

> "This Plan may be amended by the Company at any time or
> from time to time, to modify, alter or amend any or all of its
> provisions without consent of any Affiliate, Employer, Employee,
> or Participant under the Plan, unless restricted by a collective
> bargaining agreement."

Defendants' Exh.H-3, pg. 83, ACL000768.

The 2003 Plan also contains a "Termination of the Plan" provision similar to the termination provision in the 1994 Plan. Article 13, Section 13.2 states in pertinent part:

> "The Company and the Employers expect and intend to
> continue the Plan indefinitely, but continuance is not
> assumed as a contractual obligation, and the Company
> reserves the right to terminate, in whole or in part, at any
> time, subject to any limitation on such right as may be
> contained in a collective bargaining agreement, and the
> Employers reserve the right to terminate participation in the
> Plan."

Defendants' Exh.H-3, pg. 83, ACL000768.

## 2003 Summary Plan Description

In November 2003 ACLTS issued a revised summary plan description (SPD) for the 2003 Plan. Defendants' Exh.H (SJ) - Bruns Declaration and attached Exh.H-4. The coordination of

benefits provisions set forth in Article IV(D) and (F) of the 2003 SPD are identical to the

coordination of benefits provisions set forth in Article III, Section 10(d) and (f) of the 1997 SPD.

Defendants' Exh.H-4, pgs. 40, ACL000942 and 41, ACL000943.

Just as the 1997 SPD, the 2003 SPD contains a provision entitled "Future of the Plans"

which states in pertinent part:

> "The Employer intends to continue the health care plan and
> weekly indemnity benefit indefinitely. However, the Employer
> reserves the right to amend or terminate them at any time and
> for no reason at all. For example, the plan or benefit may be
> changed to comply with new federal, state or local laws or
> regulations. Or the plan may be terminated for business or other
> reasons."

Defendants' Exh.H-4, pg. 63, ACL000965.

Although the various plan documents required ACLTS to establish and maintain an

Employee Benefit Plan that was incorporated by reference into each applicable CBA, no CBA

required ACLTS to provide copies of the Employer Benefit Plan to the UMWA. In fact, the 1997

SPD specifically allows for any employee and/or participant to see plan documents in the Plan

Administrator's Human Resources Department office during normal business hours. ERISA,

§104(b)(4), 29 U.S.C. §1024(b)(4) requires the plan administrator, upon written request of any

plan participant or beneficiary, to furnish a copy of the latest SPD and any other relevant plan

documents, including the applicable collective bargaining agreement. It is undisputed that

ACLTS did not send copies of the 1994 Plan and/or the 1997 SPD to UMWA, or that UMWA

ever received copies of the 1994 Plan and/or the 1997 SPD from other sources, or that copies of

same were maintained in the files of the UMWA District 12 offices. Mumbower Declaration [23-1], ¶¶ 11(a) and (b)[5]; Butler Declaration [23-3], ¶17 and 18[6].

It is undisputed that each of the Retiree Plaintiffs who was shown the 1994 Plan at their respective depositions did not recall receiving a copy of the 1994 Plan, and upon being shown said Plan, did not recognize it. Retiree Plaintiffs McCord, Meyer, Skaggs and Jackson did not recall, at their respective depositions, receiving a copy of the 1997 SPD and when shown said SPD, did not recognize it. However, Retiree Plaintiff Holt did possess a copy of the 1997 SPD prior to this litigation. Furthermore, in 2005, upon request from ACLTS for a copy of the 2003 Plan, plaintiffs received a copy of same. It is undisputed that no plaintiff requested a copy of any plan documents, prior to 2005, or requested copies of plan documents and did not receive same

<u>2008 CBA</u>

On October 26, 2007, prior to the expiration of the 2004 CBA, UMWA and ACLTS began negotiating for a new CBA. The parties ultimately reached agreement on a new CBA in mid-2008. The 2008 CBA between UMWA and defendant ACLTS became effective July 16, 2008 and expires by its terms on December 31, 2010. Defendants' Exh.I-1, Butler Deposition, pgs. 28-30.

Gary Butler was the chief negotiator for UMWA during negotiations for the 2008 CBA between October 26, 2007 and June 16, 2008. Defendants' Exh.I-1, Butler Depo. pg. 32. He had been the employed as a UMWA representative since 1992. Butler Declaration, ¶1, Plaintiffs' Exh. C. Ron Airhart replaced Butler as chief negotiator for UMWA during the June 16-18, 2008 bargaining sessions. Defendants' Exh. J, Airhart Deposition, pgs. 43, 48-49; Defendants' Exh. I ,

---

[5]except for portions previously stricken by the Court.

[6]except for portions previously stricken by the Court.

Butler Depo., pgs. 40-42, 183-184. Airhart had been employed as a UMWA representative since 1993. Airhart Declaration, ¶3 and ¶4, Plaintiffs' Exh. D. Over the years, their job responsibilities have included collective bargaining, grievance-arbitration, and assisting members with matter related to health and retirement benefits. Plaintiffs' Exh. C - Butler Declaration; Plaintiffs' Exh. D - Airhart Declaration. Also involved with the 2008 CBA negotiations for the UMWA were Bill Derringer and James Louvier.

ACLTS was represented during bargaining for the 2008 CBA by Stacey Barry, Director of Human Resources for Defendant ACL; Richard Bruns, Director of Compensation and Benefits for Defendant ACL; and Brian Easley, outside counsel for Defendant ACL.

Prior to April 1, 2008, one subject of negotiations were the provision of healthcare benefits to retirees. ACLTS wanted to eliminate pension and retiree medical benefits for all retirees. Defendants' Exh F(attached to Document 28 - Defendants' Response to Plaintiffs' Statement of Material Facts) - Barry Deposition, pg. 34. This desire to eliminate retiree medical benefits to all retires was verbalized during at least one of the bargaining sessions. Defendants' Exh. F [28], pgs. 62-63. Although Barry had voiced this desire to UMWA, he was not sure that UMWA had agreed to bargain over employees who had retired prior to the expiration of the 2004 CBA. Defendants' Exh. F [28], pgs. 34-36.

The "First Company Proposal" of ACLTS on November 19, 2007 did not include any aspect of Article XX of the 2004 CBA. The proposal contained an "Employee Benefits" section in Article XII that did not address the provision of medical benefits for individuals who could retire during the term of the contract. After receiving the "First Company Proposal", Butler informed ACLTS that the UMWA wanted the Company to provide medical benefits to individuals

who could retire and take their pensions.  Barry informed UMWA that ACLTS would not agree to this provision.

After ACLTS declared impasse in early March 2008, contract negotiations over the 2008 CBA broke off.  Meanwhile, UMWA had filed unfair labor practices with the National Labor Relations Board in St. Louis alleging that ACLTS had engaged in bad faith bargaining and discriminatory conduct.  Plaintiffs' Exh.D - Butler Declaration, ¶7.  On May 24, 2008 the NLRB issued an unfair labor practice complaint alleging that ACLTS had engaged in bad faith bargaining, had unlawfully declared an impasse, and had unlawfully terminated certain bargaining unit employees.  Plaintiffs' Exh. 19.

In an effort to resolve the unfair labor practice case and reach agreement on a 2008 CBA, UMWA and defendant ACLTS agreed to set aside June 16,17 and 18, 2008 for further negotiations.  During the June negotiations, ACLTS again expressed its intention to eliminate retiree healthcare benefits for "all retirees".  Defendants' Exh. M - Barry Depo., pgs. 62-63, 76-77. Easley told Airhart that the company (ACLTS) wanted relief to terminate medical benefits "down the road" and that he wanted to cut medical benefits for pensioners.  Defendants' Exh. J - Airhart Depo., pgs. 78-81; Defendants' Exh. M - Barry Depo., pgs. 83-84.  During the June bargaining sessions, ACLTS never told any of the UMWA representatives that discussions about retiree healthcare benefits only referred to future retirees.  Defendants' Exh.B [28], Butler Depo., pgs. 119-22.

Prior to the start of the June 2008 bargaining sessions, UMWA requested from ACLTS a seniority list which showed the "seniority date" for active employees, active employees that had been hired prior to 2001, and active employees who had been hired after January 1, 2008. Defendants's Exh. I - Butler Depo., pgs. 122-23.  The seniority list does not identify the

employees' birthdates. Plaintiffs' Exh. 20. Before beginning the June 2008 bargaining sessions, the UMWA representatives met as a group to discuss their strategy, including Airhart trying to get ACLTS to offer something on retiree healthcare. Defendants' Exh. B - Butler Depo., pgs. 185-86.

On June 16, 2008 UMWA and ACLTS met in Collinsville, Illinois. The Union provided ACLTS with a summary of open contract subjects. Airhart expressed UMWA's concern over bargaining unit members who had the age and years of service to retire and might feel compelled to forego retirement because they could not afford the loss of employee healthcare benefits. He also expressed his concern about the individuals named in the NLRB complaint who had the age and years of service to retire and were in the same position of facing a lack of health care as they drew an income only from their pensions. ACLTS and UMWA discussed the possibility of making available a corporate salaried retiree health care program that ACLTS had previously closed so that employees who wished to retire could enter as participants. Plaintiffs' Exh. C - Butler Declaration, ¶12; Airhart Declaration, ¶¶8, 9, 10; Plaintiffs' Exh. 21.

During the June 16, 2008 bargaining session, ACLTS provided UMWA with a document entitled "ACL Transportation Services Confidential Settlement Proposal" which lists the bargaining subjects that were tentatively agreed upon and those that remained open for negotiation. Plaintiffs' Exh. 22(a). This proposal also contained Article XII, §4, captioned "Retiree Medical Plan" which states, in pertinent part:

> Retiree Medical Plan: During the term of the Agreement, employees
> hired as a bargaining unit employee at the terminal on or before
> April 1, 2003 will be eligible for medical benefits under the Company's
> retiree medical program for salaried employees in accordance with the
> terms and conditions set forth in the applicable plan documents. The
> Company reserves the right to change insurance carriers, health
> maintenance organizations, or to self-insure, as it deems appropriate
> (or benefit levels as they may be affected by Medicare). Retirees shall

be required to pay the usual and customary premiums for any such
benefit programs in order to participate in these programs.

Defendants' Exh. I-1, pg. 15.  The April 1, 2003 date was mutually agreed upon by the parties

based upon the seniority list.  Defendants' Exh. B[28] - Butler Depo. pgs. 122-23; Defendants'

Exh. C [28] - Airhart Depo., pgs. 195-96; Defendants' Exh. M - Barry Depo., pgs. 74-75.

ACLTS never told any UMWA representative during bargaining that Article XII, §4

applied only to employees who retired during the effective dates of the 2008 CBA.  Defendants'

Exh. I- Butler Depo., pgs. 119-122; Defendants' Exh. A - Derringer Depo., pg. 119.

From June 16 through June 18, 2008 UMWA and ACLTS continued to trade proposals

on several open bargaining subjects upon which agreement had not yet been reached.  Plaintiffs'

Exhibits 22(a)-22(g).  UMWA agreed and accepted the "Complete Agreement" provision

contained in Article XVIII, §1 of the 2008 CBA, which reads in pertinent part:

> Complete Agreement: This Agreement contains all the provisions
> agreed upon by the parties hereto and concludes negotiations on all
> matters, including past practices, for the life of the Agreement except
> as otherwise provided.  No representative of either party has authority
> to make, and neither of the parties shall be bound by any statement,
> representation or agreement not set forth herein . . .

Defendants' Exh. I-1, pg. 21.

On June 18, 2008 the parties reached a final tentative agreement.  Airhart and Butler met

with the Local Union members working at the St. Louis terminal to explain the contract before it

was submitted to a ratification vote.[7]  Only July 16, 2008, a majority of the bargaining unit

employees voted for ratification and the 2008 CBA became effective.  Plaintiffs' Exh. C - Butler

Declaration, ¶15; Plaintiffs' Exh. D - Airhart Declaration, ¶15; Plaintiffs' Exh. 23.

---

[7]Only bargaining unit members; i.e. active employees, may vote on a tentative agreement.
Retirees/pensioners may not attend the "explanation meeting" nor vote on the tentative contract.

<u>Implementation of Modified Retiree Medical Benefits</u>

On or about July 2, 2008 defendants' medical benefits department mailed a letter to all of

the Retiree Plaintiffs who were, at that time, eligible to receive benefits under the ACL Salaried

Retiree Medical Plan.  Each letter stated, in pertinent part:

> "Pursuant to the recent expiration of the bargaining agreement
> between ACL and the UMWA (Local 2452), **your retiree medical,**
> **pharmacy and vision coverages will be ending on July 31, 2008.**
> However, ACL is offering you the opportunity to enroll in the
> ACL Salaried Retiree Medical Plan . . . Enclosed with this letter
> are a general description of the medical plan that is available to
> you and the cost of coverage . . . In order to have retiree medical
> coverage, you **MUST** enroll in the program through NEBCO.  **If**
> **you do not enroll before the end of the [sic] July 2008, you will**
> **not have ACL retiree medical coverage for the remainder of**
> **2008 (and beyond).**

Defendants' Exh. H - Bruns Declaration, ¶8; Defendants' Exh. G - Deposition of Wayne Skaggs,

Exh. G-5, pgs. 63-64; Defendants' Exh. F - Deposition of Leroy Shea, pgs. 41-42, Exh. F-1;

Defendants' Exh. E - Deposition of Donald Meyer, pgs. 48-49, Exh. E-5; Defendants' Exh. D -

Deposition of Ken Holt, pgs. 53-54, Exh. D-1; Defendants' Exh. C - Deposition of Kathryn C.

McCord, pgs. 50-51, Exh.C-1.

Retiree Plaintiffs Holt and Skaggs have maintained retiree healthcare through the plans

offered by ACLTS since their respective retirement date.  Both of them enrolled in the 2008 ACL

Salaried Retiree Medical Plan when it was offered to them in July 2008.  Defendants' Exh. D -

Holt Depo., pgs. 16-17; Defendants' Exh. G - Skaggs Depo., pg. 68.

Retiree Plaintiff Meyer has maintained retiree healthcare through the plans offered by

ACLTS since his retirement.  However, he chose to enroll only in the medical portion, not the

prescription portion, of the 2008 ACL Salaried Retiree Medical Plan when it was offered to him

in July 2008.  Defendants' Exh. E - Meyer Depo., pgs. 50-51.

Since his retirement in the Spring of 2006, Retiree Plaintiff Shea has never sought to enroll in any of the defendants' medical plans, including the 2008 ACL Salaried Retiree Medical Plan because he did not understand that he was eligible to do so. Defendants' Exh. F - Shea Depo., pgs. 11-13. During the relevant time-period he has received healthcare benefits through his wife's healthcare plan, and later (upon her retirement), through Medicare. Shea Depo., pgs. 28-32.

Since her husband's death in 2001, Retiree Plaintiff Jackson has never applied for healthcare benefits through the plans offered by ACLTS because of her non-eligibility. Defendants' Exh.B - Deposition of Debbie Jackson, pgs.16-18.

Although her husband passed away in June 1996, Retiree Plaintiff McCord did not apply for healthcare benefits under any healthcare plan provided by ACLTS until 2006. Defendants' Exh. C - McCord Depo., pg. 27. She chose not to enroll in the 2008 ACL Salaried Retiree Medical Plan when it was offered to her in July 2008. McCord Depo., pgs. 50-55.

As of August 1, 2008, the medical plan offered to the Retiree Plaintiffs prior to that date was superceded by the ACL Salaried Retiree Medical Plan established under the 2008 CBA. Defendants' Exh. N - Bruns Deposition, pg. 36.

Between July 2, 2008 and August 1, 2008, UMWA expressed its belief to the defendants that the Union had not agreed to a change in the provision of medical benefits to retirees. The defendants countered that they believed that an agreement had been reached via the 2008 CBA, and that the defendants had the right to change retiree medical benefits. On August 8, 2008, the UMWA filed a Resolution of Dispute (ROD) on behalf of Plaintiff Retiree Kenneth Holt challenging the defendants' alleged unilateral termination of Holt's and other ACLTS' pensioners' existing health care coverage. Article XX(e)(5) of the 2004 CBA provides that disputes regarding the Employer Benefit Plan are to be submitted to and resolved by the UMWA Health

and Retirement Funds Trustees. However, because ACLTS had not made contributions to a UMWA-BCOA ROD Trust, the Funds Trustees would not accept the Holt ROD. UMWA Exhibit E - Declaration of Brian E. Sanson.

On November 17, 2008 the UMWA and the Retiree Plaintiffs filed this instant cause of action.

The plaintiffs claim that, in 2008, the defendants violated the provisions of prior CBAs negotiated between the parties in 1999 and 2004, by unilaterally modifying the Retiree Plaintiffs' medical benefits as provided under the prior CBAs. They believe that the prior CBAs guaranteed them "lifetime benefits" that could never be changed by subsequent CBAs, even after the prior CBAs had expired.

Defendants contend that the medical benefits provided to the Retiree Plaintiffs were never "vested"; i.e. that the relevant CBAs and applicable plan documents clearly state that the retiree medical plans were coterminous with the relevant CBAs and subject to change periodically through the usual collective bargaining process. The subject medical benefits are fixed only for the duration of the CBAs - not in perpetuity. Furthermore, defendants contend that UMWA had the authority to bargain on behalf of the Retiree Plaintiffs regarding medical benefits, and did so.

"Under ERISA, vesting of welfare (such as health) benefits - unlike pension benefits - is not statutory, so `[a]n employer offering welfare benefits may unilaterally modify or terminate benefits at the employer's discretion, so long as the employer has not contracted an agreement to the contrary.'" Crown Cork & Seal Co., Inc. v. International Association of Machinists & Aerospace Workers, 501 F.3d. 912, 920 (8th Cir. 2007) *quoting* Hughes v. 3M Retiree Med. Plan, 281 F.3d. 786, 790 (8th Cir. 2002); *see*, Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d. 872, 877 (8th Cir. 2009); American Federation of State, County and Municipal

Employees v. City of Benton, Arkansas, 513 F.3d. 874, 884 (8th Cir. 2008)(*citing* Crown Cork, *supra.*).  Thus, the primary issue before this Court is whether the 2008 CBA and the applicable medical plan reduces or eliminates benefits that have already vested (on behalf of the Retiree Plaintiffs).  In the instant action, the plaintiffs have the burden of proof on the issue of vesting.  Halbach, at 877; Hughes, at 791; Hutchins v Champion Intern. Corp., 110 F.3d. 1341, 1345 (8th Cir. 1997)(burden is on claimant to show that welfare benefits had vested under the terms of the plan).[8]

The Court's analysis begins with the plain language of the relevant CBAs and plan documents using the standard principles of contract interpretation and law of trusts.  *See*, Halbach, at 877.  Extrinsic evidence may not be considered by a court if the relevant CBA and plan document provisions are unambiguous.  *See*, Jensen v. SIPCO, 38 F.3d. 945, 950 (8th Cir. 1994); Howe v. Varity Corp., 896 F.2d. 1107, 1110 (8th Cir. 1990).

Retiree health benefits fail to vest if limited by a clause "expressly limiting the duration of the retirement health benefits . . . to the duration of the Master Agreement."  John Morrell & Co. v. United Food & Commercial Workers Int'l Union, 37 F.3d. 1302, 1307 (8th Cir. 1994); *see*, City of Benton, at 884 *quoting* John Morrell, *supra*.  Such benefits will also fail if the agreement contains a blanket reservation of rights to an employer to unilaterally modify or terminate such benefits. Crown Cork, at 918; *see*, City of Benton, at 884 *citing* Crown Cork, *supra*.

Each of the relevant CBAs contains clear durational clauses that specifically limit the retiree medical benefits to the term of the relevant CBA.  The 1994 CBA provides that "[t]he benefits provided by [ACLTS] to its eligible [p]articipants pursuant to such plan shall be

---

[8]The plaintiffs' claims are brought pursuant to ERISA and LMRA.  There appears to be no dispute as to the applicability of the Court's factual and legal findings to plaintiffs' claims whether grounded in ERISA and/or LMRA.

guaranteed during the term of this Agreement by [ACLTS] at levels set forth in such plan." 1994 CBA, Article XX(c)(3)(i). There are two (2) other similarly worded duration clauses in the 1994 CBA. *See*, Article XX(h) and Article XX(h)(10). Both the 1999 and 2004 CBAs contain nearly identical duration clauses in their respective agreements. 1999 CBA, Article XX(c)(3)(i), Article XX(h), Article XX(h)(10); 2004 CBA, Article XX(c)(3)(i), Article XX(h), Article XX(h). A term clause expressly limiting the duration of retirement health benefits to the duration of the relevant CBA is inconsistent with an intent to vest health benefits for life. John Morrell, at 1307 *citing* Anderson v. Alpha Portland Industries, 836 F.2d. 1512, 1519 (8th Cir. 1988). "[I]t would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date." Anderson v. Alpha Portland Industries, at 1519 *citing* Bidlack v. Wheelabrator Corp., 993 F.2d. 603, 609 (7th Cir. 1993). Retiree medical benefits provisions in a CBA, like most contractual obligations, will cease, in the ordinary course, upon termination of the bargaining agreement. Litton Fin.Printing Div. v. NLRB, 501 U.S. 190, 207 (1991). "[A] court should cast a cold eye on contentions that a contract with a fixed term actually created a perpetual obligation." Des Moines Mailers Union, Teamsters Local No. 358 v. NLRB, et. al., 381 F.3d. 767, 771 (8th Cir. 2004) *quoting* Bidlack, at 606. "If a contractual provision is worded in such a way that its duration can be construed consistent with the fixed term of the agreement, then that reading typically is at least a reasonable construction." Des Moines Mailers Union, at 771.

Plaintiffs do not dispute the existence of these durational clauses nor their applicability. Furthermore, plaintiffs do not suggest any ambiguity in the language of said clauses. Plaintiffs simply refer to these clauses as "guarantee" clauses and then seek to have the Court put these clauses in context by reviewing the bargaining history between UMWA and the BCOA. As the

Court has already noted, the bargaining history between the BCOA and the UMWA is irrelevant since the agreements in question were negotiated between the UMWA and ACLTS.

Moreover, the bargaining history between the UMWA and ACLTS demonstrates that the retiree medical benefits were changed periodically through the normal collective bargaining process. The plaintiffs concede that changes were made to the retiree medical benefits in the 2004 CBA and that ACLTS provided medical benefits to the Retiree Plaintiffs in accordance with these modifications; however, plaintiffs contend that these modifications were "insignificant". Whether or not the plaintiffs believe the modifications were "insignificant" is immaterial. The fact remains that retiree medical benefits have been changed in the past and this fact further lends credence to the argument that said benefits are not vested. John Morrell, at 1308. In John Morrell, *supra.*, the Court found that the Union and Employer had routinely modified health benefits packages for past retirees without first submitting the changes to the past retirees for approval and without any objections from past retirees upon implementation. John Morrell, at 1306. Given this fact, the Court reasoned that neither Morrell nor the Union thought they were modifying vested benefits. John Morrell, at 1307, n.8. "Rather, the fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested." John Morrell, at 1308 *citing* Anderson v. Alpha Portland Ind., at 1519.

Furthermore, the applicable plan documents contain clear reservations of rights clauses that are inconsistent with the notion that the retiree medical benefits are vested. For example, both the 1994 and 2003 Plans contain similar reservation of rights clauses which specifically reserve the right to terminate the plan, in whole or in part, by ACLTS. 1994 Plan, §13.2; 2003 Plan, §13.2. The Eighth Circuit has routinely held that "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits." Stearns v. NCR

Corp., 297 F.3d. 706, 712 (8th Cir. 2002) *quoting* Jensen v. SIPCO, at 950; *see also*, Windstream

Corp. v. Berggren, 2008 WL 5423850, *7-8 (D.Neb. 2008). There must be affirmative vesting

language in the plan to overcome an unambiguous reservations of rights clause. Stearns, at 712;

Windstream Corp. v. Berggren, at *7. In Crown Cork, the Court found that a blanket

reservations of rights clause entitled "Future of The Plan" which stated that "Continental hopes

and expects to continue the Plan indefinitely, but reserves the right to change or terminate it in the

future, subject naturally, to any outstanding contractual agreements." was "fatal to any vesting

argument.". Cork Crown, at 919.

In the instant case, the reservations of rights clauses at issue are nearly identical to the

language in the reservations of rights clause reviewed by the Court in Crown Cork. This Court

concurs with the holding in Stearns, *supra.*, that where there is no "affirmative indication of

vesting" in the CBA, "an unambiguous reservations-of-rights provision is sufficient without more

to defeat a claim that retirement welfare plan benefits are vested." Stearns, at 712; *see*, Crown

Cork, at 919 *citing* Stearns, *supra.*[9]

Furthermore, the applicable summary plan descriptions (SPD) also contain reservations of

rights language. The 1997 SPD in a section entitled "Future of the Plans" states:

> "The Company intends to continue the plans in this handbook indefinitely.
> However, the Company reserves the right to amend or terminate them at
> any time. For example, the plans may be changed to comply with federal,
> state, or local laws or regulations. Or the plans may be terminated for
> business reasons."

The 2003 SPD contains nearly identical language in a section entitled "Future of the Plans."

---

[9]The Court realizes that the plaintiffs argue that certain language in the General
Description portions of the relevant plan documents should be viewed by the Court as "vesting"
language. This argument will be address shortly.

Again, this clear language in the relevant reservations of rights clauses entitling ACLTS to modify or terminate the plans is fundamentally inconsistent with the concept of vested retiree medical benefits.

Additionally, the relevant plan documents also include coordination of benefits clauses that offset employer-provided healthcare benefits with benefits that participants have through "other plans". Article 9 of both the 1994 and 2003 Plans is entitled "Coordination of Benefits and Subrogation Provisions". Both Plans state, *inter alia* that "the Benefits that would otherwise be payable hereunder shall be reduced to the extent that the sum of the Benefits payable for Allowable Expenses hereunder and the benefits payable for Allowable Expenses under all `other plan' . . . shall not exceed the total applicable Allowable Expenses." Defendants' Exh. H-1; Defendants' Exh. H-3. Moreover, the 2003 Plan addresses the issue of reduction of retiree benefits with respect to Medicare noting that "once a Retiree Participant, or the Dependant of a Retiree Participant, becomes entitled to Medicare, the plan of Benefits shall change to the Medicare-Eligible Retiree Expense Benefits . . .". The 1994 Plan has a similar provision.

Like reservation of rights clauses, coordination of benefits clauses are "inconsistent with vesting." Crown Cork, at 919 *citing* John Morrell, at 1308; Anderson v. Alpha Portland, at 1519.

The relevant CBAs, and applicable plan documents contain clear duration clauses, reservation of rights clauses, and coordination of benefits clauses which the Eighth Circuit has repeatedly held are inconsistent with vesting. These clauses, in concert with the fact that changes have been made to the retirees' medical benefits in the past without objection, demonstrates to the Court that the subject retiree medical benefits are not vested.

Although the plaintiffs cannot point to any terms in the relevant CBAs or applicable plan documents that explicitly vest retiree health benefits, they assert that certain language in the

General Description portions of the relevant CBAs show that the parties intended that the subject benefits vest. First, plaintiffs argue that the language in the General Description portions of the relevant CBAs show an intent to vest benefits because they contend the language provides coverage "for life" and/or "until death". The Court disagrees.

The provision(s) in question states:

GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

"The parties expressly agree that the language references to "for life' and "until death" that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees who retired between February 1, 1993 and the Effective Date, or who retire during the term of this Agreement. A retiree shall be considered to be a retiree of an Employer if his last signatory classified employment was with such Employer. The benefits and benefit levels provided by an Employer under its Employer Plan are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement."

This language is used in both the 1999 and 2004 CBAs.

Also contained in these CBAs is an express disclaimer as to the applicability of any statement made in the General Description. In Article XX, §(a) of both the 1999 and 2004 CBAs, it is stated:

"The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans."

This same sentence is repeated in the General Description provision of both the 1999 and 2004 CBAs.

As has already been pointed out, the Eighth Circuit has continually held that the presence of durational clauses, reservation of rights clauses, and/or coordination of rights clauses preclude

any notion of vested benefits. In Crown Cork, the Court reviewed language that included "continues until your death" and held that "[T]his is not explicit vesting language, and in any case, it is inconsistent with the reservations-of-rights clause . . . which controls." Crown Cork, at 919. The Crown Cork Court cited to the Court in Howe v. Varity Corp., 896 F.2d. 1107, 1009 (8th Cir. 1990) noting that the Court had previously held that the retirees' burden of proving vesting of welfare benefits had not been met by the "employer's promise to provide welfare benefits `until death of retiree' where the employer had expressly reserved the right to amend or terminate the plan. Crown Cork, at 919. In John Morrell, *supra.*, the Court reviewed a clause providing for benefits for a surviving spouse and dependent children until "the earlier of the surviving spouse's death or remarriage . . .". The Court concluded that such a clause did not create vested benefits in light of the presence of duration and coordination of benefits clauses which are inconsistent with vesting. John Morrell, at 1308-09.

Plaintiffs cite to two (2) other Eighth Circuit cases in support of their argument that the inclusion of "for life" and/or "until death" language in regarding benefits is highly probative of the intent to vest benefits: Anderson v. Alpha Portland Ind., *supra.* and Jensen v. SIPCO, *supra.* In Anderson, the Court held that a clause in the applicable SPD that provided, in part, for plan coverage that "will continue for the remainder of your life" was not vesting language in light of the existence of specific durational clauses and coordination of benefits clauses in applicable CBAs. Anderson, at 1518-19.

In Jensen, *supra.*, the Eighth Circuit did find that a clause appearing in a SPD did demonstrate an intent to vest retiree medical benefits; however, this finding is limited in scope. The Court reviewed the language in the SPD promising that benefits "would be provided until the retiree dies, a spouse divorces, or a child marries or reaches age 19." Jensen, at 950. The Court

found that such language was "vesting" language based upon factors not present in the instant case. The applicable medical plan (in <u>Jensen</u>) contained language that limited the employer's right to make changes to the benefits in dispute. The reservation of rights clause in <u>Jensen</u> stated, "Unless otherwise expressly provided therein, amendments shall not be applicable to persons who are receiving pensions hereunder prior to the effective date of such amendment." <u>Jensen</u>, at 949. The Court found such language ambiguous as to whether the employer intended to reserve the right to modify benefits for persons who were already retired. <u>Id.</u>, at 950. Furthermore, the Court found that "overwhelming extrinsic evidence" existed demonstrating that the employer intended for retiree medical benefits to vest. <u>Id.</u>, at 951.

In the instant case, the reservation of rights clauses are clear and unambiguous in retaining the right to modify or terminate benefits to ACLTS. Furthermore, given the clear language of the duration, reservation of rights, and coordination of benefits clauses present in the CBAs and applicable plans in the instant case, there is no "overwhelming extrinsic evidence" demonstrating that ACLTS intended for retiree medical benefits to vest. Furthermore, the "for life" and "until death" language does not appear in the retiree medical benefits portion of any relevant CBA in this case. It is only present in the General Description introductory paragraph for both the pension and medical benefits provisions. In fact, it does not appear in the retiree medical benefits provision of Article XX in the relevant CBAs; only appearing again in the pension section of Article XX in the relevant CBAs. This absence in one section but presence in another section raises a strong inference that retiree medical benefits were not intended to vest. This inference, coupled with the disclaimer in the same General Description paragraph that specific provisions of the plans govern in the event of any inconsistencies between the General Description and the

plans, simply fails to lend credence to the plaintiffs' contention that retiree medical benefits vested.

Finally, the Court has carefully reviewed two (2) Seventh Circuit cases which address the plaintiffs' arguments regarding "for life" and/or "until death" language vesting retiree medical benefits: <u>United Mine Workers, et. al. v. Brushy Creek Coal Co.</u>, 505 F.3d. 764 (7th Cir. 2007) and <u>Cherry, et. al. v. Auburn Gear, Inc.</u>, 441 F.3d. 476 (7th Cir. 2006). The Seventh Circuit carefully reviewed such language in light of the existence of reservation of rights clauses and duration clauses in the relevant CBAs and plan documents. In both cases, the Court found that the reservation of rights clause prevails making the "lifetime benefits" limited to the duration of the contract.

> "It is well-established that `lifetime' benefits can be limited to the duration of a contract. We have previously found that where a reservation of rights clause coexists with a guarantee of lifetime benefits, `[w]e must resolve the tension between the lifetime benefits clause, and the plan termination and reservation of rights clauses, by giving meaning to all of them . . .[A]lthough the plan in its current iteration entitles retirees to health coverage for the duration of their lives and the lives of their eligible surviving spouses, the terms of the plan - including the plan's continued existence - are subject to change at the will of [the employer].'"

<u>Cherry v Auburn Gear</u>, at 483-84 (citations omitted). The <u>Cherry</u> Court upon review of the applicable reservation of rights clause found that "[A]t the end of each CBIA, lifetime benefits ceased and Auburn Gear was free to revoke or modify benefits. So long as the CBIA was in effect, benefits remained valid; when the CBIA ceased to be effective, `lifetime benefits' ceased as well." <u>Cherry</u>, at 484.

In <u>Brushy Creek</u>, the UMWA raised arguments similar to the ones it has raised in the instant case. Firstly, the Court noted that the "lifetime benefits" language cited by the UMWA appeared only in the General Description of the applicable CBA It further noted that "disclaimer

language" in favor of specific provisions of the plans governing in the event of inconsistencies appeared also elsewhere in the applicable CBA; and there were specific termination/duration clause(s) in the applicable plan documents. The Court held that, in light of the duration clause(s), the "lifetime benefits" language in the General Description had to be eliminated to avoid inconsistency. Brushy Creek, at 767. It further noted that "it makes sense that the detailed provisions of the health plan would prevail over inconsistent language in a collective bargaining agreement that deals with a variety of other subjects, such as notice or change of ownership, that might pertain to [the employer's] right to change the plan." Brushy Creek, at 767.

Secondly, the Brushy Creek Court found that "for life" language was not "illusory" because

> "As long as the health plan is in effect, the retirees are entitled to benefits until they die. Indeed, as far as we know, they are still receiving benefits, albeit at a reduced level. If the plan did not create benefits "for life", it would be unclear when the benefits ended. Terminable benefits for life are benefits that go on regardless of the age of the worker or how long ago he retired, but that cease if the plan conferring those benefits ends."

Thus, the Brushy Creek Court held that, in light of the duration clauses, the "for life" language in the UMWA multi-employer labor agreement did not create vested medical benefits. Id.

The Seventh Circuit's holdings in Cherry, *supra.* and Brushy Creek, *supra.* mirror the Eighth Circuit's analysis and holdings in favor of duration, reservation of rights, and/or coordination of benefits clauses prevailing in the face of generalized "for life" language. This Court finds that the reasoning and ultimate holdings in Cherry, *supra.* and Brushy Creek, *supra.* to be highly persuasive.

Finally, the plaintiffs argue simply that the UMWA never agreed to negotiate retiree medical benefits because retiree benefits are a permissive subject of bargaining. *See*, Allied

Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157 (1971). They further contend that the UMWA representatives at the bargaining sessions did not believe that they were negotiating retiree medical benefits for **past** retirees.

Firstly, UMWA may bargain retiree benefits if it chooses to do so. *See*, Allied Chemical, 404 U.S. at 181, n. 20; Anderson v. Alpha Portland Ind., 727 F.2d. 177, 182 (8th Cir. 1984)(*citing* Allied Chemical, *supra.*). The Retiree Plaintiffs all acknowledge that the UMWA has negotiated over medical benefits and benefit levels in the past on their behalf, and that the UMWA has the authority to do so.

Secondly, the plaintiffs appear to argue that even if retiree medical benefits were a subject of negotiation, "negotiations for retiree benefits are presumed to address the retirement of existing employees"; i.e. not those persons already retired. Again, the Retiree Plaintiffs have all conceded that the UMWA has the authority to negotiate health benefits on their behalf, and has done so in the past. Furthermore, Article XII, §4 of the 2008 CBA, titled "Retiree Medical Plan" provides, in pertinent part:

> "During the term of the Agreement, **employees hired as a bargaining unit employee at the terminal on or before April 1, 2003** will be
>
> eligible for medical benefits under the Company's retiree medical
>
> program for salaried employees in accordance with the terms and
>
> conditions set forth in the applicable plan documents . . . "

Defendants' Exh. I-1 (emphasis added). Each Retiree Plaintiff admits to having been "an employee hired as a bargaining unit employee at the terminal on or before April 1, 2003." UMWA was aware of this provision as of June 16, 2008, several days prior to the final negotiation of the 2008 CBA (which included this language). Furthermore, this provision makes no attempt whatsoever to indicate that it is exclusive to active employees or in someway applies

to retirees other than the Retiree Plaintiffs.  UMWA was aware that the ACL Salaried Retiree Medical Plan terms differed from the plan established by the 2004 CBA when it agreed to this provision.

Thirdly, the testimony of all persons present during the 2008 CBA negotiations indicates that defendants' representatives repeatedly informed the UMWA representatives of their desire to eliminate (initially) retiree healthcare benefits for "all retirees"; and that they were ultimately willing to modify such benefits for "all retirees".  The UMWA representatives concede that at no time did any defendants' representatives tell any UMWA representative that the "Retiree Medical Plan" referred to in Article XII, §4 applied only to employees who retired during the term of the 2008 CBA.  Finally, the UMWA signed off on the 2008 CBA which included a clearly-drafted integration clause:

> "Complete Agreement: This Agreement contains all provision agreed upon by the parties hereto and concludes negotiations on all matters, including past practices . . . No representative of either party has authority to make, and neither of the parties shall be bound by any statement, representation or agreement not set forth herein . . ."

Defendants' Exh. I-1. The Court agrees with the reasoning of the Cherry Court that "termination of benefits without reference to extrinsic evidence is appropriate where the text of an agreement, accompanied by an integration clause, provides no gaps to fill or ambiguous terms to be interpreted."  Cherry, at 483.

In conclusion, upon a plain reading of the relevant CBAs and the applicable plan documents, those controlling plan documents explicitly and unambiguously reserve to defendants the right to terminate, modify, or amend the retiree medical benefits provided to the Retiree Plaintiffs.  The plaintiffs have failed to identify any language in the relevant CBAs and/or applicable plan documents stating specifically that benefits survive the termination of the

applicable plan. The plaintiffs have failed to identify any language in the relevant CBAs and/or applicable plan documents stating specifically that amendments to the health benefits plans are not applicable to the Retiree Plaintiffs. The plaintiffs have failed to show that the retirement benefits at issue in this case are vested. No relevant CBA or applicable plan document contains an express promise to vest the subject retiree medical benefits; on the contrary, the relevant CBAs and applicable plan documents contain express duration clauses, reservation of rights clauses, and coordination of benefits clauses. The existence of these facially unambiguous clauses, pursuant to Eighth Circuit law, defeats the plaintiffs' claim of vested retirement health benefits.

In light of the Court's findings of fact and conclusions of law, the Court concludes that defendant ACLTS is not obligated to provide benefits to the Retiree Plaintiffs pursuant to the terms of any CBA or medical health plan other than those benefits as provided by the 2008 CBA and its applicable healthcare benefits plan (the ACL Salaried Retiree Medical Plan). The Court realizes that this is an additional cost to those already living cautiously in an uncertain economy; however, the Court believes that the Seventh Circuit has succinctly expressed the difficulties of a case as the one before this Court:

> "Either lack of communication or an inadequate performance on the part of the Union led the retired employees and their survivors to believe their benefits could not be terminated . . . We are mindful of the burden placed upon retired individuals with fixed incomes who now must bear an unexpected increase in healthcare costs. `However, we are bound to determine only whether a legally sufficient agreement between the parties exists to support the plaintiffs' claim.' If a union `wants to assure that employer-paid health benefits for the workers they represent are vested they will have to insist on explicit language to this effect.' In this case, the Union failed to obtain the necessary contractual language.
>
> The distinction between lifetime benefits and vested benefits is `a legal distinction that understandably escaped' many of the retirees. `It is difficult to imagine that someone without legal

training would be able to fully comprehend a reservation of rights clause and how a court would interpret such a clause.' To avoid this information gap, Union representatives must be mindful of their responsibility to deliver the benefits they have promised and not guarantee benefits they have failed to obtain through explicit contractual language.

The contractual language at issue in this case was clear: `lifetime' benefits extended only so long as the collectively bargained insurance agreement remained in effect."

Cherry, at 486 (internal citations omitted).

In light of the above findings of fact and conclusions of law, this Court determines that no material issues of fact exist and that the plaintiffs have failed to bear their burden of proof to demonstrate that their retiree medical benefits vested. Defendants are entitled to summary judgment, as a matter of law, on all of the plaintiffs' claims.

Dated this __30th__ day of November, 2010.

_____
UNITED STATES DISTRICT JUDGE